January 24, 2024

**Supreme Court**

No. 2022-219-Appeal.
(P 20-2673)

John J. Cronan          :

v.                      :

Laurie A. Cronan.       :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

John J. Cronan             :

v.              :

Laurie A. Cronan.          :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  This appeal concerns the divorce of the plaintiff, John Cronan, and the defendant, Laurie Cronan.  The defendant appeals from a decision pending entry of final judgment entered by the general magistrate of the Family Court.  On appeal, the defendant argues that the general magistrate was not authorized to preside over the parties' contested divorce trial.  The defendant additionally contends that the general magistrate erred with respect to the merits of his decision.  For the reasons set forth in this opinion, we affirm the decision of the Family Court.

**I**

**Facts and Travel**

The plaintiff filed a complaint for divorce on July 8, 2020, citing "irreconcilable differences that exist between the parties which have caused the irremediable breakdown of the marriage."  The parties were married in July 2006

- 1 -

and have no children together.  Although the complaint requested that the case be placed on the nominal track calendar, matters soon became contested and the case was scheduled for trial.  A justice of the Family Court heard several motions at the outset of the litigation, but the case was eventually assigned to the general magistrate, who presided over all subsequent proceedings.[1]

The trial commenced in October 2021 and was heard over five days.  Five witnesses testified at trial, including both parties.  We set forth only the testimony relevant to the issues on appeal.

The plaintiff presented Paul St. Onge, a certified public accountant, to testify as to the value of plaintiff's premarital assets.  St. Onge testified that he has known plaintiff since 1983 and defendant since 2007.  He testified that he, in the past, prepared tax returns for both parties and that he continues to prepare plaintiff's tax returns.  St. Onge affirmed that "there c[a]me a time when John Cronan asked [him] to put together a list or a summary of investment assets or accounts that [plaintiff] had in June of 2006, which would be prior to John and Laurie's marriage on July 4th, 2006[,]" and that he complied with this request.

According to the document St. Onge prepared, plaintiff's funds totaled $1,755,506.34 on June 30, 2006, prior to his marriage to defendant.  St. Onge further

---

[1] At no point during the hearings before the general magistrate did defendant object to having the general magistrate preside over the proceedings.

testified as to how he prepared the document, stating that he has "a system that keeps track of asset values on a daily basis. It keeps track of all transactions." He testified that this information was pulled "electronically" rather than from paper files and that he went into his portfolio accounting system where the information is stored to prepare the document. He further explained that plaintiff's largest asset—his 401(k) from Rhode Island Medical Imaging (RIMI)—was managed by Prudential Financial in 2006 and that he submitted a request to Prudential for a statement as to that asset, but was told that it might take a few weeks for Prudential to provide the statement.

Defense counsel objected to the document prepared by St. Onge being entered as a full exhibit, arguing that it is not the best evidence; he suggested that statements from Prudential would be the best evidence. Counsel for plaintiff countered that the document was "a business record." When questioned by the general magistrate, St. Onge affirmed that the document is "a true and accurate record of what [he] pulled off, the data from the databases, what the value of the accounts were" and that "[i]t's not a situation where [he] took the values today and tried to extrapolate back to what they were[;] those were actual records that [he] pulled information from[.]" St. Onge then explained that he had records dating back to the 1990s, but that paper statements ceased to exist after 2003, when he switched to electronic means. The general magistrate allowed the document to be entered as a full exhibit and indicated that,

"with respect to the assets, if paper verification from [Prudential] can be generated, you should submit that." It does not appear that those statements were produced.

The plaintiff then called Jane McAuliffe, a certified divorce financial analyst, to testify on the issue of defendant's entitlement to alimony.[2] In her testimony, McAuliffe stated that she "work[s] with clients one on one and help[s] them navigate the division of assets and budgeting and cash flow as they proceed through divorce." Her process involves three steps: (1) budgeting and identifying the client's expenses and cash flow; (2) identifying and quantifying the makeup of the marital estate; and (3) financial planning, money management, and tax planning. As noted by the general magistrate, McAuliffe "formulated a financial plan for [defendant] based on a life expectancy of age of 90, suggested assets of $3,946,605 from the marriage, and a listing of expenses identified in [defendant's] DR-6."

McAuliffe also testified that she did not include employment income for defendant in formulating her plan. Furthermore, she testified that, based on her projections—with an estimated 5.3 percent rate of return and with a budget of $163,000 a year, which includes taxes, healthcare, and lifestyle expenses— defendant would have an estimated $5.5 million left over upon turning ninety.

---

[2] Although it does not appear from the transcript that plaintiff's counsel moved to qualify McAuliffe as an expert witness, it is clear from the transcript and from the decision that the court accepted her as an expert witness and treated her as such. Furthermore, her experience and qualifications were thoroughly laid out in the record.

McAuliffe additionally noted that 5.3 percent was "conservative" and that if defendant "stays a little bit more growth oriented in the investments and the market keeps on returning positively, she would do better than this scenario."

The defendant called John E. Barrett, Jr., a certified public accountant, who was qualified as an expert and testified as to the value of plaintiff's equity interest in RIMI. Barrett testified that he was hired to give the valuations for the dates of June 30, 2021, and June 30, 2006. Barrett testified that, in preparing his report, he spoke with the certified public accountant for RIMI, and he reviewed "financial statements prepared by the certified public accounting firm for the calendar years December 31st, 2016 through December 31st, 202[0]"; "[t]he federal corporate income tax returns for the calendar years December 31st, 2016 through December 31st, 2020"; "internal year-to-date financial information for the company through June 30th, 2021"; and "a forecast for the company for 2021."

Prior to Barrett's testimony as to the substance of his report, plaintiff's counsel indicated that he would not "dispute Mr. Barrett's amounts that he came up with, both for June of 2021 and for the non-marital amount he came up with for June of 2006[,]" but rather whether RIMI's shareholder agreement or Barrett's report is controlling. Barrett testified that he used the fair market value as the standard to determine the value of plaintiff's equity interest in RIMI because in Rhode Island,

for divorce purposes, that is the commonly used standard. He defined fair market value as follows:

> "[I]t's basically defined by the Internal Revenue Service. Revenue Ruling 59-60 would be the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."

In his opinion, the fair market value for plaintiff's 2.1 percent equity interest in RIMI as of June 30, 2021, was approximately $1,229,000.

When questioned about the shareholder agreement on cross-examination, Barrett affirmed that the annual valuation indicated that plaintiff's 2.1 percent equity interest in RIMI was worth $366,200 as of December 31, 2020,[3] a "different outcome" than his approximately $1.2 million valuation. He further affirmed that the valuation he provided was "an estimate." Barrett then explained that it was his opinion that "the fair market value of a 2.1 percent equity interest in RIMI as of the 6/30/2021 valuation date is the $1,229,000"; however, he "understand[s] that the buy/sell agreement allows for a physician, nonowner physician of RIMI right now to buy in at the 366,200 number." He further indicated that the shareholder

---

[3] During plaintiff's testimony, he reviewed a letter from RIMI's CPA that was entered into evidence indicating that the value per share of RIMI as of December 31, 2020, was $3,662. A letter dated September 18, 2020, confirmed that plaintiff's 2.1 percent equity interest in RIMI is equivalent to one hundred shares.

agreement did not contain a requirement to sell in a specific manner, and that "there is language in [the agreement] that provides for the seller to go out and find an outside party that might be willing to pay more."

Following the trial and post-trial motions, the general magistrate issued a 108-page decision on May 3, 2022. The general magistrate laid out the testimony of each of the witnesses and the evidence before him. Thereafter, he addressed the contested issues and made twenty-seven findings of fact.

Ultimately, applying the factors set forth in G.L. 1956 § 15-5-16.1, the general magistrate determined that the marital estate should be divided on a 60/40 basis in favor of plaintiff. It was his determination that "both parties share equal responsibility for the breakdown of their marriage by their conduct and their spoken words to the other." He further found that "[i]t is uncontroverted that [plaintiff] was the sole source of income throughout the marriage, and the accumulated marital estate is solely from money earned by [plaintiff]."

On the issue of plaintiff's equity interest in RIMI, the general magistrate reviewed the testimony of Barrett and plaintiff's two challenges to Barrett's analysis: the first being that plaintiff owned greater than 2.1 percent interest in RIMI in 2006 and the second being that the equity interest is defined by the shareholder agreement.

Prior to trial, defendant had filed a motion *in limine* to preclude plaintiff from "contending that the value of his interests in Rhode Island Medical Imaging (RIMI)

and Melcor Corporation should be determined based on or in light of a shareholder stock redemption agreements [*sic*] between the shareholders of stock or other equity interests in RIMI and Melcor." She submitted that he had "litigated the exact same question in a prior divorce proceeding" involving plaintiff and his former wife and that the trial justice there "rejected plaintiff's claim and valued Dr. Cronan's interests in the business without regard to the shareholder redemption agreements."

The general magistrate ultimately declined to apply the doctrine of collateral estoppel "because of factual differences that exist today [with regard to plaintiff's first marriage] [and] because application of the doctrine would be inherently unjust." Specifically, he highlighted that the decision by the trial justice in the first divorce case was rendered twenty-two years ago, when plaintiff was early in his career and there was greater potential for RIMI to be sold; he determined that plaintiff is now approaching retirement and has expressed his intent to retire and that the value of his equity interest is unlikely to be enhanced by a merger, sale, or acquisition.

He further stated that "the shareholder agreement is a binding agreement between RIMI and [plaintiff] upon his retirement dictating the value of [plaintiff's] buy out value. To accept [defendant's] position would be inequitable in this circumstance, wherein she would receive a far greater value and portion of an asset that [plaintiff] is not likely to receive." He therefore determined that the value of

plaintiff's equity interest in RIMI would be based on the binding shareholder agreement and valued at $366,200, per the December 31, 2020 valuation.

As to the premarital assets, the general magistrate indicated that he found St. Onge's testimony to be "without bias to either party and [that] his testimony was accurate and reliable." He further stated that the document produced by St. Onge was created "in the normal course of his business * * *." Of the $1,755,506 premarital value that St. Onge identified, the general magistrate ultimately found that plaintiff used $261,676 to fund an account in defendant's name. Accordingly, he determined that the total value of plaintiff's premarital assets was $1,493,830.

The general magistrate additionally permanently denied defendant's request for alimony, based on defendant's "independent ability to support herself in the future." In coming to this conclusion, he relied on defendant's own testimony as well as on the testimony of McAuliffe, which he deemed "helpful, reliable, and credible."

A decision pending entry of final judgment entered on May 19, 2022. The defendant filed a notice of appeal to this Court the same day.

The defendant additionally filed a notice of conditional appeal from the general magistrate's decision to the chief judge of the Family Court pursuant to Rule 73 of the Family Court Rules of Domestic Relations Procedure citing "potentially

conflicting language" between Rule 73[4] and G.L. 1956 § 14-1-52.[5]  The record indicates that the Family Court has not addressed the merits of this conditional appeal, which were set forth in a memorandum submitted on August 2, 2022, and appear to be the same as those issues now before this Court.

On June 15, 2022, defendant filed a motion for a new trial, arguing that "the [g]eneral [m]agistrate who presided over the trial did not have the requisite constitutional, statutory, administrative or other legal authority to do so."  She submitted that the general magistrate's decision and the resulting decision pending entry of final judgment were void *ab initio*.  The record indicates that defendant's motion for a new trial was not heard in Family Court.

On August 26, 2022, an amended final judgment was issued granting the divorce and indicating that "[a]ll other matters set forth in the Decision Pending Entry of Final Judgment, except the question of the divorce itself, are hereby left open pending the appeal to the Rhode Island Supreme Court."

---

[4] Rule 73(a) of the Family Court Rules of Domestic Relations Procedure provides that "[a]n appeal from a judgment, order, or decree of a general magistrate or a magistrate shall be referred to the chief judge or the chief judge's designee.  The review shall be appellate in nature and on the record."
[5] General Laws 1956 § 14-1-52(a) provides for an appeal to this Court "[f]rom any final decree, judgment, order, decision, or verdict of the family court * * *."

- 10 -

## II

## Discussion

On appeal, defendant submits that the general magistrate made a number of errors. First, she takes issue with the authority of the general magistrate in presiding over the contested divorce. Second, she contends that the general magistrate erred in his distribution of the marital assets. Third, she asserts that plaintiff "did not meet his burden in establishing the value of his 'alleged' premarital accounts." Fourth, she submits that the general magistrate erred in denying her request for alimony. Fifth, defendant argues that she "has essentially been frozen out of any portion of the marital estate * * *."

## A

## Power of the General Magistrate

The defendant submits multiple claims of error as to the general magistrate's authority to preside over a contested divorce trial. The defendant argues that the applicable statutes limit the function of presiding over a contested divorce to judges alone. Additionally, defendant alleges that a magistrate presiding over a trial in any court violates three state and federal constitutional principles: separation of powers, due process, and equal protection.

We need not, however, address the statutory and constitutional challenges to the general magistrate's authority because it is clear to us that defendant has failed

- 11 -

to preserve this issue for appellate review. Significantly, in her brief, defendant admits that "[t]here is no argument that the defendant did not raise at trial the issue of the magistrate's ability to conduct the proceeding." The defendant, however, argues that the raise-or-waive rule is inapplicable because the issue is one of subject-matter jurisdiction and, even if the raise-or-waive rule is applicable, this case meets the Court's narrowly applied exception to the rule. We review each contention *seriatim*.

## Subject-Matter Jurisdiction

First, defendant argues that "the application of the raise or waive rule in this case is an issue of subject matter jurisdiction." Quoting this Court's opinion in *Pine v. Clark*, 636 A.2d 1319 (R.I. 1994), she submits that "[a] challenge to subject-matter jurisdiction questions the very power of the *court* to hear the case. It is an axiomatic rule of civil procedure that such a claim may not be waived by any party and may be raised at any time." *Pine*, 636 A.2d at 1321 (emphasis added).

Notably, defendant is not challenging the jurisdiction of the Family Court over the divorce proceeding—and there is no claim that the Family Court lacks subject-matter jurisdiction over a contested divorce proceeding—but rather she is challenging the *authority* of the general magistrate to preside over the contested divorce proceeding. The issue thus becomes whether subject-matter jurisdiction attaches to the *court* itself or the *officer* of the court.

As this Court has noted, "[s]ubject-matter jurisdiction is the very essence of the *court's* power to hear and decide a case." *Long v. Dell, Inc.*, 984 A.2d 1074, 1079 (R.I. 2009) (emphasis added).  This Court has noted, on occasion, that the term "subject-matter jurisdiction" is often misused; "[w]hen properly used, it refers only to a court's power to hear and to decide a particular case * * *, and not to whether a court, having the power to adjudicate, should exercise that power." *Cranston Teachers Association v. Cranston School Committee*, 120 R.I. 105, 108-09, 386 A.2d 176, 178 (1978).  "The term 'lack of jurisdiction over the subject matter' means quite simply that a given court lacks judicial *power* to decide a particular controversy." *Pollard v. Acer Group*, 870 A.2d 429, 433 (R.I. 2005).[6]  Additionally, Black's Law Dictionary defines subject-matter jurisdiction as "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a *court* can rule on the

---

[6] This Court has recently addressed the meaning of "judicial power":

> "Furthermore, under our state constitution, 'the judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish.' R.I. Const., art. 10, § 1.  Thus, all judicial power is reserved to the courts and has been since the adoption of the state constitution in 1842. *Lemoine v. Martineau*, 115 R.I. 233, 238, 342 A.2d 616, 620 (1975).  We have 'defined the exercise of judicial power as the control of a decision in a case or the interference with its progress, or the alteration of the decision once made.' *Id.* (emphasis omitted) (citing *Taylor v. Place*, 4 R.I. 324 (1856))." *Quattrucci v. Lombardi*, 232 A.3d 1062, 1066 (R.I. 2020) (brackets omitted).

- 13 -

conduct of persons or the status of things." Black's Law Dictionary 1020 (11th ed. 2019) (emphasis added).

In the case at bar, defendant takes issue with the authority of the general magistrate to preside over a contested divorce; such an issue does not implicate the subject-matter jurisdiction of the Family Court. *Cf. Clark v. Poulton*, 963 F.2d 1361, 1367 (10th Cir. 1992) (concluding that, even assuming that the magistrate exceeded his authority, such an error would be "a procedural lapse, not a jurisdictional failing"); *Griego v. Padilla*, 64 F.3d 580, 583 (10th Cir. 1995) ("A magistrate judge's lack of statutory authority is not a jurisdictional defect; thus, objection to such authority is waived if not timely raised."); *United States v. Wey*, 895 F.2d 429, 431 (7th Cir.), *cert. denied*, 497 U.S. 1029 (1990) ("Subject-matter jurisdiction is absent when a federal court may not issue a binding decree on a subject—perhaps because Congress has not authorized it, perhaps because the Constitution does not allow it. Which judicial officer presides during jury selection does not affect the court's subject-matter jurisdiction, for it has nothing to do with whether the tribunal may enter a judgment conclusively resolving this dispute. The judgment (that is, the sentence) of the district court concerns a federal crime and is binding. Everyone was in the right court. Courts may err, even offend against the Constitution, without losing subject-matter jurisdiction."); *United States v. Maragh*, 189 F.3d 1315, 1317 (11th Cir. 1999) ("We used [the term subject-matter jurisdiction] in Gomez as a

synonym for 'authority,' not in the technical sense involving subject-matter jurisdiction. The judgment here is the judgment of the District Court; the relevant question is whether it had subject-matter jurisdiction; and there is no doubt that it had. The fact that the court may have improperly delegated to the Magistrate a function it should have performed personally goes to the lawfulness of the manner in which it acted, but not to its jurisdiction to act."). It stands to reason that a challenge to a magistrate's *authority* is not an issue of subject-matter jurisdiction.

Accordingly, defendant's arguments as to the general magistrate's authority to preside over a contested divorce trial are subject to our well-settled raise-or-waive rule.

### Exception to the Raise-or-Waive Rule

The defendant further argues that the issue of whether the general magistrate has authority to preside over a contested divorce falls into this Court's narrow exception to the raise-or-waive rule.[7]

---

[7] We pause to address defendant's characterization of this Court's long-standing raise-or-waive rule. The defendant states the following in her brief:

> "The 'waive' element of the raise or waive rule requires the same elements as any other waiver. In order to apply, the waiver has to be knowing and intelligent. *See, e.g.*, *State v. Sampson*, 24 A.3d 1131, 1141 (R.I. 2011). Moreover, '[w]aiver is an intentional and voluntary relinquishment of a *known* right.' *Commonwealth v. Lucarelli*, 971 A.2d 1173, 1179 (Pa. 2009) (quoting

- 15 -

"According to this Court's well settled raise-or-waive rule, issues not properly presented before the trial court may not be raised for the first time on appeal." *Donnelly Real Estate, LLC v. John Crane Inc.*, 291 A.3d 987, 994 (R.I. 2023) (quoting *Borgo v. Narragansett Electric Company*, 275 A.3d 567, 576-77 (R.I. 2022)). "We also recognize that there is a narrow exception to the raise-or-waive rule where the alleged error is more than harmless, and the exception implicates an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Decathlon Investments v. Medeiros*, 252 A.3d 268, 270 (R.I. 2021) (quoting *State v. Brown*, 9 A.3d 1240, 1246 (R.I. 2010)).

The defendant couches her argument in the three-part test set forth in *State v. Florez*, 138 A.3d 789 (R.I. 2016), which states:

> "To fall within this exception, the defendant must show: (1) that the error complained of amounts to more than harmless error; (2) that a sufficient record exists to permit
>
> *United States v. Goldberg*, 67 F.3d 1092, 1099-1101 (3d Cir. 1995)[emphasis supplied]."

This is a misstatement of our raise-or-waive rule. The defendant conflates the criminal waiver standard, citing a case involving a criminal defendant's waiver of his constitutionally protected right to counsel, with this Court's well-settled rule regarding preservation of arguments on appeal. Put simply, under the raise-or-waive rule, "a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *E.T. Investments, LLC v. Riley*, 262 A.3d 673, 676 (R.I. 2021) (quoting *Cusick v. Cusick*, 210 A.3d 1199, 1203 (R.I. 2019)). Therefore, if a party does not *raise* the argument before the trial court, then the argument is *waived* on appeal. *See id.*

- 16 -

a determination of the issue; and (3) that counsel's failure to raise the issue before trial must be premised upon a novel rule of law that counsel could not reasonably have known during the trial." *Florez*, 138 A.3d at 796 (brackets omitted) (quoting *Cronan ex rel. State v. Cronan*, 774 A.2d 866, 878 (R.I. 2001)).

According to defendant, each element is met in this case. The defendant first submits that "the error here is not harmless since it determines whether there should have been a trial at all." Second, defendant argues that, because this issue is a question of law, "the existing record is sufficient to make a determination." Third, defendant contends that, because "the judicial officers themselves evidently did not know" that the general magistrate was not empowered to try a contested divorce case, "this Court should not find that the defendant's counsel knew or should have known[.]" She additionally suggests that the issue is novel because it "has not previously been litigated *on the merits*."

In making this argument, defendant fails to successfully distinguish this case from our previous cases dealing with the constitutional authority of magistrates. *See McKenna v. Guglietta*, 185 A.3d 1248, 1251 (R.I. 2018) ("[T]his Court has previously stated that a challenge to the constitutional authority of a magistrate is subject to our stringent raise-or-waive rule such that claimants must raise their arguments challenging the authority of the magistrate to act in the original proceeding before that magistrate."); *Gordon v. State*, 18 A.3d 467, 474 (R.I. 2011) ("We need not * * * address this constitutional challenge to the magistrate's

- 17 -

authority because it is clear to us that applicant has failed to preserve the issue for appellate review."); *Yates v. Wall*, 973 A.2d 621, 623 (R.I. 2009) (mem.) (concluding that an applicant for postconviction relief had lost the opportunity to challenge "the constitutionality of a magistrate's statutory authorization" by "failing to raise [that issue] at the trial level").

The defendant indicates that this case differs from that of *McKenna* because *McKenna* "did not involve the clear dichotomy extant here, *i.e.*, the difference—if there is one—between magistrates and judges." She contends that "*McKenna* was concerned with the process by which magistrates are appointed[,]" whereas the issue in this case is "whether magistrates are in fact judges in disguise * * * [a]nd if they are, then the disguise is so effective that ordinary lawyers appearing before them would have no way of knowing that there is an issue to raise." This distinction, however, does not reveal "a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Decathlon Investments*, 252 A.3d at 270 (quoting *Brown*, 9 A.3d at 1246). The defendant's three constitutional challenges— separation of powers, due process of law, and equal protection—are not "novel," and the question of the general magistrate's authority could reasonably have been known to counsel at the time of trial.

Furthermore, this issue could have been "litigated on the merits," as defendant suggests, had she raised the issue in the Family Court. Notably, defendant filed a

motion for a new trial on June 15, 2022, the crux of her argument being that "the [g]eneral [m]agistrate who presided over the trial did not have the requisite constitutional, statutory, administrative or other legal authority to do so." This motion for a new trial came *after* she had already filed a notice of appeal to this Court on May 19, 2022; the Family Court did not address the motion for a new trial presumably because defendant had filed a notice of appeal to this Court.

Accordingly, because defendant did not challenge the authority of the general magistrate in the Family Court, we deem the issue waived on appeal.

**B**

**Claims of Error**

The defendant additionally submits multiple claims of error as to the merits of the general magistrate's decision pending entry of final judgment. General Laws 1956 § 8-10-3.1 provides, in relevant part:

> "(d) A party aggrieved by an order entered by a magistrate shall be entitled to a review of the order by a justice of the family court. Unless otherwise provided in the rules of procedure of the family court, such review shall be on the record and appellate in nature. The family court shall by rules of procedure establish procedures for review of orders entered by a magistrate, and for enforcement of contempt adjudications of a magistrate.
>
> "(e) Final orders of the family court entered in a proceeding to review an order of a magistrate may be appealed to the supreme court."

It appears that the Family Court did establish a relevant rule of procedure;[8] Rule 73(a) of the Family Court Rules of Domestic Relations Procedure states that "[a]n appeal from a judgment, order, or decree of a general magistrate or a magistrate shall be referred to the chief judge or chief judge's designee. The review shall be appellate in nature and on the record."

In accordance with Rule 73(a) and the procedure set forth therein, we are of the opinion that the merits of this case should have been addressed by the "chief judge or chief judge's designee" before defendant filed a notice of appeal to this Court. *See Bowman v. Forgue*, 184 A.3d 1130, 1130 (R.I. 2018) (mem.) ("Although the general magistrate of the Family Court heard the plaintiff's motions and granted the plaintiff partial relief, which was then upheld by a trial justice of the Family Court, the plaintiff nonetheless appealed to this Court."). However, in the interest of judicial economy and efficiency, we address the arguments here, stressing that future litigants should follow the procedure set forth in Rule 73.

**Standard of Review**

"This Court will not disturb findings of fact made by a trial justice or magistrate in a divorce action unless he or she has misconceived the relevant

---

[8] Rule 73 of the Family Court Rules of Domestic Relations Procedure was adopted in 2014. *See In re Amendments to the Family Court Rules of Domestic Relations Procedure and the Family Court Rules of Practice* (Misc. Order entered Oct. 31, 2014).

- 20 -

evidence or was otherwise clearly wrong." *Sullivan v. Sullivan*, 249 A.3d 637, 641 (R.I. 2021) (quoting *Boschetto v. Boschetto*, 224 A.3d 824, 828 (R.I. 2020)). "Consequently, unless it is shown that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof, this Court will not disturb the trial justice's findings." *Id.* (quoting *Boschetto*, 224 A.3d at 828).

## Distribution of Marital Estate

The defendant argues that the general magistrate abused his discretion and/or committed clear error in equitably distributing the marital estate in two ways. First, she alleges that the general magistrate erred in determining the value of plaintiff's equity interest in RIMI. She maintains that collateral estoppel should apply because the issue was previously litigated in plaintiff's prior divorce case. Second, she contends that the general magistrate erred in awarding plaintiff 60 percent of the marital estate, arguing that he "ignored uncontradicted sworn statements of fact in his decision * * *."

### 1

We first address defendant's argument as to whether collateral estoppel should have applied to the determination of the value of plaintiff's equity interest in RIMI. The defendant contends that the magistrate erred by refusing to impose the doctrine of "offensive collateral estoppel" against plaintiff when considering the value of his equity interest in the medical practice. The defendant indicates that, in

- 21 -

plaintiff's first divorce, decided in 1999, the trial justice used the fair market value of RIMI rather than the shareholder agreement to assess the value of plaintiff's equity interest in the practice. The defendant suggests that collateral estoppel should apply to preclude plaintiff from relying on the shareholder agreement in this case because it was rejected in the prior case. The defendant also argues that evidence plaintiff presented to establish the value of RIMI was unreliable because it did not establish the fair market value of the practice.

"Under the doctrine of collateral estoppel, an issue of ultimate fact that has been actually litigated and determined cannot be re-litigated between the same parties or their privies in future proceedings." *Doe v. Brown University*, 253 A.3d 389, 396 (R.I. 2021) (quoting *Foster-Glocester Regional School Committee v. Board of Review*, 854 A.2d 1008, 1014 (R.I. 2004)).

> "'Subject to situations in which application of the doctrine would lead to inequitable results,' collateral estoppel is applied when: '(1) the parties are the same or in privity with the parties of the previous proceeding; (2) a final judgment on the merits has been entered in the previous proceeding; and (3) the issue or issues in question are identical in both proceedings.'" *Id.* (brackets omitted) (quoting *Foster-Glocester Regional School Committee*, 854 A.2d at 1014).

This Court has opined that collateral estoppel should not "be mechanically applied, for [it is] capable of producing extraordinarily harsh and unfair results." *Apex Oil Company, Inc. v. State by and through Division of Taxation*, 297 A.3d 96, 111 (R.I.

- 22 -

2023) (quoting *Casco Indemnity Company v. O'Connor*, 755 A.2d 779, 782 (R.I. 2000)). "To avoid unfairness, courts have declined to apply collateral estoppel in situations in which the doctrine would lead to an inequitable result." *Casco*, 755 A.2d at 782.

In addressing the RIMI issue in his decision, the general magistrate laid out the relevant testimony and addressed the arguments made in defendant's motion *in limine*. The general magistrate ultimately found that the doctrine of collateral estoppel does not apply "because of factual differences that exist today" and further that it should not apply "because application of the doctrine would be inherently unjust." He then supported that determination with the following facts:

> "The decision by [the former chief judge] was rendered twenty-two (22) years ago. [The plaintiff] was early in his working years and there was a much greater potential for RIMI to be sold or acquired by merger prior to [plaintiff's] retirement than there is today. [The plaintiff] is now 71 years old and retirement is imminent and/or soon approaching. His contract is expiring at Brown University and he would by necessity revert to a staff radiologist after June, which he is not planning to do. He has been a member of the Board at RIMI and testified it is rare for anyone to work at RIMI past the age of 65. He testified it is his intent to retire this year. There is a far less likelihood at this stage of [plaintiff's] career that the value of his RIMI stock would be enhanced by merger, sale or acquisition, as opposed to twenty-two (22) years ago when [the chief judge] heard and decided [plaintiff's] first divorce matter."

Based on the findings of fact made by the general magistrate, we are satisfied that the general magistrate did not err in declining to apply the doctrine of collateral estoppel. It is clear that he considered the facts and circumstances in concluding that "application of the doctrine would be inherently unjust." *See Casco*, 755 A.2d at 782.

**2**

We turn now to the crux of defendant's argument regarding the valuation of plaintiff's shares in RIMI.

"The justices of the Family Court are vested with broad discretion as they seek to fairly divide marital property between the parties in divorce proceedings." *Sullivan*, 249 A.3d at 641 (quoting *Boschetto*, 224 A.3d at 828). "It is well established that the equitable distribution of property is a three-step process." *Id.* (quoting *Boschetto*, 224 A.3d at 828). "The trial justice first must determine which assets are marital property, then must consider the factors set forth in G.L. 1956 § 15-5-16.1(a), and, finally, he or she must distribute the property." *Id.* (brackets omitted) (quoting *Boschetto*, 224 A.3d at 828).

At issue with regard to the first step is the determination of the value of plaintiff's equity interest in RIMI. The defendant submits that the general magistrate abused his discretion in determining the value of that equity interest in accordance with the shareholder agreement. Specifically, defendant submits that the proper

valuation of that equity interest is $1,229,000, which, according to her expert, is its fair market value.

The plaintiff presented evidence that his one hundred shares of the practice were worth $100,302.58, or $1,003.03 per share, in 2006, when the parties were married. According to plaintiff, those shares were worth $3,662 each, or $366,200 in total, as of December 2020. These amounts were based on RIMI's shareholder agreement, not on the practice's fair market value. That value, according to defendant's expert witness, Barrett, was $1,229,000 in 2021.

As Barrett readily acknowledged, utilization of the fair market value versus the annual valuation set forth by RIMI yielded "two different outcomes." Furthermore, Barrett testified that he "underst[oo]d that the buy/sell agreement allows for a physician, nonowner physician of RIMI right now to buy in at the 366,200 number." The general magistrate determined that the shareholder agreements "are clear in that, to perpetuate the corporation, provisions were made for the disposition of shares of stock among shareholders *upon death, retirement or withdrawal from employment*" and that those agreements "set the buy in/buy out price." He found that

> "the shareholder agreement is a binding agreement between RIMI and [plaintiff] upon his retirement, dictating the value of [plaintiff's] buy out value. To accept [defendant's] position would be inequitable in this circumstance, wherein she would receive a far greater

value and portion of an asset that [plaintiff] is not likely to receive."

We discern no error in the general magistrate's analysis. He highlighted the history of employees who have come and gone for a price consistent with the provisions of the shareholder agreements—both in 2019 and 2020—as testified to by Barrett. Such testimony and evidence further support the general magistrate's determination that the value of plaintiff's equity interest in RIMI is "to be set based on the terms of the binding shareholder agreement * * *."

Accordingly, we are satisfied that the general magistrate did not misconceive the relevant evidence, nor was he otherwise clearly wrong, as to the valuation of plaintiff's equity interest in RIMI as $366,200.

**3**

The defendant additionally takes issue with the general magistrate's execution of the second and third steps of the equitable distribution of property: the consideration of the factors set forth in § 15-5-16.1(a) and the distribution of the property. *See Sullivan*, 249 A.3d at 641. She submits that the general magistrate erred in awarding plaintiff 60 percent of the marital estate. Specifically, defendant relies upon her assertion that the general magistrate did not afford plaintiff's response to requests for admissions any evidentiary weight and that they were "sparsely referenced in passing (not considered, weighed, evaluated or factored) in the court's decision[.]"

The second step of the analysis requires the general magistrate to consider the

factors set forth in § 15-5-16.1(a), which include:

"(1) The length of the marriage;

"(2) The conduct of the parties during the marriage;

"(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;

"(4) The contribution and services of either party as a homemaker;

"(5) The health and age of the parties;

"(6) The amount and sources of income of each of the parties;

"(7) The occupation and employability of each of the parties;

"(8) The opportunity of each party for future acquisition of capital assets and income;

"(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;

"(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;

"(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and

"(12) Any factor which the court shall expressly find to be just and proper."

The general magistrate noted the requests for admissions in his recitation of the facts, and he made at least one specific reference to the substance of the admissions. Indeed, in his discussion of the distribution of assets, the general magistrate noted that "[plaintiff] has acknowledged that he was looking at pornography, that he called [defendant] names that were demeaning and insulting and that there were incidents as [defendant] explained for which he later apologized." As this Court has continually stated, a judicial officer "need not 'explicitly list his or her findings on each factor' so long as this Court can determine that the [judicial officer] considered 'all the necessary facts and statutory factors.'" *DiDonato v. DiDonato*, 295 A.3d 828, 834 (R.I. 2023) (quoting *Sullivan*, 249 A.3d at 644).

In his decision, the general magistrate thoroughly reviewed the testimony of the parties and the witnesses in the case. We defer to the general magistrate's findings of fact in divorce proceedings. *DiDonato*, 295 A.3d at 834.

In the case at bar, the general magistrate engaged in a comprehensive discussion of the statutory factors enumerated in § 15-5-16.1(a). It was his determination that "both parties share equal responsibility for the breakdown of their marriage by their conduct and their spoken words to the other." After reviewing the testimony and assessing the credibility of the parties, it was his finding that "[i]t is

uncontroverted that [plaintiff] was the sole source of income throughout the marriage, and that the accumulated marital estate is solely from money earned by [plaintiff]. [The defendant] was laid off in or around the first year of the parties' marriage and has not earned any money since that time."

The general magistrate ultimately determined that

> "In consideration of the length of the parties' marriage, the respective contributions made to the marriage by the parties, their respective contributions to asset accumulation and preservation during this fifteen (15) year marriage, their age and health, as well as all other factors explained herein, the Court is of the opinion that the marital estate should be divided 60/40 in favor of [plaintiff]."

We are of the opinion that the general magistrate did not abuse his discretion, nor was he otherwise clearly wrong, in awarding plaintiff 60 percent of the marital estate.

**Premarital Assets**

The defendant next contends that plaintiff failed to meet his burden of establishing the value of his premarital assets. Specifically, defendant argues that the magistrate erred in relying on the "inherently unreliable" testimony of plaintiff's accountant regarding the premarital value of his retirement accounts. Rather than present statements from this time, the accountant prepared a summary of plaintiff's investment accounts and their value as of June 30, 2006. The defendant claims that the general magistrate should not have relied on this summary because no source documents were presented to substantiate the summary.

To the contrary, the general magistrate found that plaintiff's witness, St. Onge, "testified without bias to either party and his testimony was accurate and reliable." He determined that the summary of plaintiff's assets offered by St. Onge was created in the normal course of business, by maintaining "a system that tracks transactions and the value of assets from the mutual fund companies daily."

It is clear from both the decision of the general magistrate during trial to admit the document prepared by St. Onge into evidence and his written decision that he classified the document as a business record of the kind referred to in Rule 803(6) of the Rhode Island Rules of Evidence. The general magistrate specifically questioned St. Onge as to the production and creation of the document he offered, and he ultimately allowed it into evidence over the best-evidence objection of defense counsel. He again indicated in his decision that "[t]he document was retrieved from [plaintiff's] file and is one customarily prepared by Mr. St. Onge at or near the time dated thereon."

The defendant cites one case in support of her contention that plaintiff failed to meet his burden in establishing the premarital value of his assets. *See Ryan-Gamron v. Gamron*, 47 A.3d 333, 335 (R.I. 2012) (mem.). Unlike the case at bar, the trial justice there determined that "[n]o credible evidence was provided at trial" as to a premarital mortgage and that the plaintiff "failed to provide valid documentation regarding a mortgage." *Id.* Here, the general magistrate found the

- 30 -

testimony of St. Onge to be "accurate and reliable" and, when questioned by the general magistrate as to how the document he produced was created, St. Onge affirmed that the document is "a true and accurate record of what [he] pulled off, the data from the databases, what the value of the accounts were" and that "[i]t's not a situation where [he] took the values today and tried to extrapolate back to what they were[;] those were actual records that [he] pulled information from[.]"

Although the general magistrate additionally noted in his decision that St. Onge made a request for paper statements as to the June 30, 2006 valuation of plaintiff's RIMI 401(k) that was formerly managed by Prudential, at the time of the decision it appears that no paper statements had been produced. Nevertheless, because the document was clearly established as a business record, we hold that the general magistrate did not abuse his discretion in admitting this evidence and, through this document and the "accurate and reliable" testimony of St. Onge, plaintiff met his burden of establishing the value of his premarital assets.

**Alimony**

Finally, defendant submits that the general magistrate erred in denying her claim for alimony. She argues that he erred in not considering all of the alimony factors, but instead in relying on McAuliffe, who made her projections on her assumption that defendant would receive a greater share of the marital assets.

"The grant of alimony is authorized by statute." *Saltzman v. Saltzman*, 218 A.3d 551, 558 (R.I. 2019) (quoting *Meyer v. Meyer*, 68 A.3d 571, 585 (R.I. 2013)). Pursuant to G.L. 1956 § 15-5-16(c)(2), "[a]limony is designed to provide support for a spouse for a reasonable length of time to enable the recipient to become financially independent and self-sufficient."

At the outset of his discussion of alimony, the general magistrate set forth the factors for determining an award of alimony as set forth in § 15-5-16(b). The general magistrate then found that defendant has an "independent ability to support herself in the future." He noted that, although she has not worked in private industry since just after her marriage in 2006, defendant indicated that she worked ten hours per day, seven days per week on her own business. The general magistrate further found that, even if defendant decides not to seek employment, she will have sufficient assets to support herself at the same standard of living she enjoyed during the marriage. He stated that his decision to deny defendant alimony "is not based on [plaintiff's] testimony that he is retiring in June, but rather on [defendant's] independent ability to support herself in the future."

The general magistrate further supported his decision to deny alimony with the "relevant and credible testimony of Jane McAuliffe, CDFA, [who was] accepted as an expert witness relating to divorce financial planning and analysis." He found that McAuliffe "formulated a financial plan for [defendant] based on a life

expectancy of age of 90, suggested assets of $3,946,605 from the marriage, and a listing of expenses identified in [defendant's] DR-6." After extensively reviewing McAuliffe's testimony, the general magistrate noted in his decision his awareness that the 60/40 division of assets in favor of plaintiff reduced the amount on which McAuliffe based her projections. He stated, "[h]owever, by the Court's calculations the marital estate to be divided has a total value of approximately $9,000,000 and the deviation still provides [defendant] with significant and substantial funds to support herself for the remainder of her life."

We discern no error in his analysis, nor in his decision to deny defendant's claim for alimony. Although he did not explicitly reference each factor as he considered it, it is clear to us that he considered each of the factors set forth in § 15-5-16(b). As long as the court did not overlook or misconceive material evidence, and as long as the court considered the elements set forth in § 15-5-16(b), we will not disturb the denial of the discretionary award of alimony. *Cf. Saltzman*, 218 A.3d at 559 ("[I]f the trial justice did not overlook or misconceive material evidence, and if he or she considered all the requisite statutory elements set forth in § 15-5-16, we will not disturb the discretionary award of alimony.") (brackets omitted) (quoting *Meyer*, 68 A.3d at 586).

It is clear from the testimony of McAuliffe and the findings of the general magistrate that without alimony, defendant will be "financially independent and

self-sufficient." Section 15-5-16(c)(2).  Indeed, the general magistrate's decision was based on defendant's "independent ability to support herself" as demonstrated by her own testimony as to her business and McAuliffe's projections.

Accordingly, we conclude that the general magistrate did not err in denying the defendant's claim for alimony.[9]

### III

### Conclusion

For the reasons set forth herein, we affirm the decision pending entry of final judgment of the Family Court.  The record may be returned to the Family Court.

---

[9] The defendant additionally alleges that, "[o]ther than the $600,000 advancement to [defendant] after the sale of the marital domicile, [plaintiff] has been in full control of the lion's share of the marital estate with no support to [defendant,]" suggesting that defendant should have been entitled to temporary support during the pendency of the case.  We now deem this issue moot.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | John J. Cronan v. Laurie A. Cronan. |
| **Case Number** | No. 2022-219-Appeal.<br>(P 20-2673) |
| **Date Opinion Filed** | January 24, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | General Magistrate Daniel V. Ballirano |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Timothy K. Baldwin, Esq. |
| | For Defendant:<br><br>Michael J. Lepizzera, Jr., Esq. |

SU-CMS-02A (revised November 2022)